# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| NV BROADCASTING, LLC, <u>et al.</u>,[1] | ) | Case No. 09-_____ (___) |
|  | ) |  |
| Debtors. | ) | Joint Administration Pending |
|  | ) |  |

**MOTION FOR ENTRY OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, AND (V) SCHEDULING A FINAL HEARING ON THE DEBTORS' MOTION TO INCUR SUCH FINANCING ON A PERMANENT BASIS**

NV Television, LLC and its direct and indirect subsidiaries (collectively, the "<u>NV Debtors</u>"), NV Media, LLC ("<u>NV Media</u>"), NVT Kansas, Inc. ("<u>NVT Kansas</u>"), and PBC Television Holdings, LLC, PBC Broadcasting, LLC and their direct and indirect subsidiaries (collectively, the "<u>PBC Debtors</u>", and together with the NV Debtors, NV Media, and NVT Kansas, the "<u>Debtors</u>") that are debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "<u>Cases</u>") hereby file their Motion for Entry of an Interim Order (i) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (ii) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (iii) Granting Liens and Superpriority Claims, (iv) Granting Adequate

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: NV Broadcasting, LLC (7998); NV Media, LLC (6012); NV Television, LLC (4400); NVT Kansas, Inc. (2060); NVT Birmingham, LLC (1537); NVT Birmingham Licensee, LLC (1535); NVT Mason City, LLC (9043); NVT Mason City Licensee, LLC (6216); NVT Portland, LLC (2561); NVT Portland Licensee, LLC (2797); NVT Hawaii, LLC (2999); NVT Hawaii Licensee, LLC (3178); NVT Wichita, LLC (2123); NVT Wichita Licensee, LLC (2241); NVT Topeka, LLC (1839); NVT Topeka Licensee, LLC (1990); NVT Topeka II, LLC (3337); NVT Topeka II Licensee, LLC (5695); NVT Youngstown, LLC (2962); NVT Youngstown Licensee, LLC (5405); NVT Savannah, LLC (8516); NVT Savannah Licensee, LLC (5428); PBC Television Holdings, LLC (7741); PBC Broadcasting, LLC (0533); PBC Broadcasting of Youngstown, LLC (3833); PBC Broadcasting of Youngstown License, LLC (3779); PBC Broadcasting of Savannah, LLC (8216); and PBC Broadcasting of Savannah License, LLC (8214).

Protection to the Prepetition Secured Parties, and (v) Scheduling a Final Hearing on the Debtors' Motion to Incur Such Financing on a Permanent Basis (the "Motion"). In support of this Motion, the Debtors have filed the Declaration of John A. Heinen in Support of Chapter 11 Petitions and First Day Pleadings (the "Heinen Declaration"). In further support hereof, the Debtors respectfully state:

## I.
## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and this Motion is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief requested herein are sections 105(a), 361, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

## II.
## BACKGROUND

3.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court") commencing the above-captioned chapter 11 cases. The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in detail in the Heinen Declaration, filed concurrently herewith and fully incorporated by reference.

4.      The Debtors have continued in possession of their respective properties and have continued to operate and maintain their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No trustee or examiner has been appointed in these chapter 11 cases, and no committees have yet been appointed or designated.

## III.
## OVERVIEW OF THE DEBTORS' BUSINESS OPERATIONS

6.      The Debtors' businesses focus primarily on the acquisition, development and operation of network affiliated television broadcasting stations.  The NV Debtors own and operate eleven major affiliated television stations, (collectively, the "NV Stations") and, through joint sales or shared services agreements, provide sales, operational, and other services to two major stations owned by the PBC Debtors (collectively, the "PBC Stations" and, together with the NV Stations, the "Stations").  The Debtors have strong relationships with major networks, including network affiliations with CBS, Fox, NBC, and ABC, which provides limited dependence on any one network affiliation.  The Debtors also have network affiliations with CW Network and MyNetworkTV, and are currently working to finalize a Telemundo affiliation in Wichita, Kansas.

7.      NVT Savannah, LLC and NVT Youngstown, LLC are parties to certain agreements pursuant to which each provides sales, operational and other services to the television broadcast station owned by PBC Broadcasting of Savannah, LLC and the television broadcast station owned by PBC Broadcasting of Youngstown, LLC, respectively, each of which are wholly-owned subsidiaries of PBC Broadcasting, LLC ("PBC Broadcasting").  NVT Savannah, LLC provides sales, operational and other services to PBC Broadcasting's station WTGS-TV (a Fox affiliate serving Hardeeville, South Carolina and portions of the Savannah,

Georgia designated market area), and NVT Youngstown, LLC provides operational and other services to PBC Broadcasting's station WYTV-TV (an ABC/MyNetworkTV affiliate serving Youngstown, Ohio). The NV Stations owned by the NV Debtors and the PBC Stations owned by the PBC Debtors operate in geographically diverse markets, which minimizes the impact of regional economic downturns.

8.     As of the Petition Date, the Debtors collectively employ approximately 720 individuals, of which 635 are full-time employees and 85 are part-time employees.

9.     The primary operating expenses involved in owning and operating the Stations are programming, advertising, production (including news), promotion, rent, utilities, depreciation and amortization, and employee salaries. The Debtors' revenues are derived primarily from local, regional and national advertising on the Stations and, to a lesser extent, from payments from cable and satellite distributors and internet revenue. The Stations' rates charged for advertising during a particular program depend upon: (i) the popularity of a program with viewers that advertisers wish to reach; (ii) the number of advertisers competing for the available time; (iii) the demographic make-up and size of the market served by the station; and (iv) the availability of alternative advertising media. Due to the Stations' dependence on advertising revenue, declines in advertising budgets, especially in recessionary periods, can dramatically impact the Debtors' businesses.

**IV.**
**RELIEF REQUESTED**

10.     To ensure the ongoing viability of the Debtors' operations and implement their strategic vision, the Debtors require immediate access to capital. Faced with this challenge and an enormous debt burden, the Debtors and their advisors pursued various options in an effort to procure liquidity necessary to preserve the going concern value of the Debtors' business. While

4

the Debtors solicited financing from various prospective lenders, in the end, the DIP Lenders (as defined below) were the only parties willing to provide financing under the circumstances. The Debtors, the DIP Lenders and the Prepetition Secured Parties (as defined below) engaged in extensive arm's length negotiations concerning a financing package that would facilitate the Debtors' goals and provide the Debtors with the necessary financing to maximize the value of their estates. The DIP Facility (as defined below), which was the product of those good faith negotiations, is well within the Debtors' sound business judgment. Moreover, the Prepetition Secured Parties, which includes the First Lien Secured Parties, the Second Lien Agent and the Second Lien Lenders (each, as defined below), have consented to the terms of the DIP Facility and the relief sought in this Motion. As a result, the Debtors respectfully submit that the DIP Facility should be approved and that they be permitted to use "cash collateral" as defined under Section 363 of the Bankruptcy Code.

11. The Debtors hereby move on an expedited basis for entry of an interim order (the "<u>Order</u>"), substantially in the form as <u>Exhibit A</u> attached hereto, and ultimately, a final order (the "<u>Final Order</u>" and, together with the Order, the "<u>DIP Orders</u>"):[2]

    (a)    under sections 105, 361, 362, and 364(c), (d), and (e) of the Bankruptcy Code, authorizing the DIP Borrowers to obtain postpetition financing in the form of a senior secured multiple draw term loan credit facility (the "<u>DIP Facility</u>") in an aggregate principal amount not to exceed $28 million in respect of new money funding, of which $16 million of new money will be available on an interim basis, pursuant to and in accordance with the terms and conditions of that certain Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement dated as of July 13, 2009 (the "<u>DIP Facility Agreement</u>", a copy of which is attached as <u>Exhibit B</u>), among the DIP Borrowers, the DIP Guarantors, and UBS AG, Stamford Branch, as administrative and collateral agent (the "<u>DIP Agent</u>"), issuing bank and a lender, and the other lenders party to the DIP Facility Agreement (collectively, the "<u>DIP Lenders</u>"), with the funds thereunder available for use in accordance with the budget (as amended, modified or updated in accordance with

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Order or the DIP Facility Agreement (defined below). To the extent that there is any conflict between this Motion and the Order, the Order shall control.

the DIP Facility Agreement, the "<u>Budget</u>", a copy of which is attached as <u>Exhibit C</u>) and the other terms set forth in the DIP Facility Agreement;

(b)     under section 364(c)(1) of the Bankruptcy Code and subject only to the Carve-Out, granting superpriority claim status to the claims of the DIP Agent and DIP Lenders under the DIP Facility Agreement;

(c)     under sections 364(c)(2), (c)(3), and (d) of the Bankruptcy Code, as security for the repayment of the borrowings and all other obligations arising under the DIP Facility Agreement, authorizing the grant of the valid, binding, continuing, enforceable, fully perfected, and unavoidable first priority senior priming DIP Facility Liens upon the Collateral (excluding Avoidance Actions), subject only to the Carve-Out and the Permitted Prior Liens;

(d)     under sections 361, 363(c), 363(e), and 364(d)(1) of the Bankruptcy Code, authorizing the Debtors' use of the Prepetition Collateral, including the Cash Collateral, in which the Prepetition Secured Parties may have an interest and to provide adequate protection to those parties with respect to, among other things, such use of the Cash Collateral and any diminution in the value of their interest in the Prepetition Collateral resulting from the implementation of the DIP Facility, the liens and security interests sought herein to secure the DIP Facility, the use, sale or lease of the Prepetition Collateral or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code;

(e)     under sections 363 and 364 of the Bankruptcy Code, authorizing the use of the proceeds of the DIP Facility to, among other things and as set forth in the approved Budget, (i) fund general corporate needs, including ongoing working capital, letters of credit, and other financing needs of the Debtors, including without limitation certain fees and expenses of professionals payable by the Debtors, (ii) pay certain transaction fees, and other costs and expenses of administration of the Cases, (iii) provide Adequate Protection, and (iv) pay fees and expenses (including, without limitation, reasonable attorneys' fees and expenses) owed to the DIP Agent and the DIP Lenders under the DIP Facility and the other DIP Facility Documents;

(f)     under section 362 of the Bankruptcy Code, modifying the automatic stay to the extent set forth in the DIP Facility Agreement and the Order;

(g)     pursuant to Bankruptcy Rule 4001, scheduling a preliminary hearing on this Motion and authorizing, from the entry of the Order until the final hearing (the "<u>Final Hearing</u>"), (i) the DIP Borrowers to obtain credit under the terms contained in the DIP Facility Agreement, and (ii) the Debtors to utilize Cash Collateral to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates; and

(h)     pursuant to Bankruptcy Rule 4001, scheduling a Final Hearing on this Motion and establishing notice procedures in respect of the Final Hearing by this Court to

consider entry of the Final Order authorizing the DIP Borrowers to borrow the balance of the DIP Facility on a final basis.

**V.**
**THE DEBTORS' PREPETITION SECURED INDEBTEDNESS**

12.     The Debtors' prepetition secured debt obligations arose under the following: the First Lien Credit Agreement, the First Lien PBC Credit Agreement, and the Second Lien Credit Agreement (all as defined below).

13.     On November 1, 2007, the NV Debtors entered into a Secured First Lien Credit Agreement (the "First Lien NV Credit Agreement", and together with all other agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith, the "First Lien NV Financing Documents") with the lenders party thereto (collectively, the "First Lien NV Lenders"), and UBS AG, Stamford Branch, as collateral agent and as administrative agent (collectively, the "First Lien NV Agent").

14.     Pursuant to the First Lien NV Financing Documents, the NV Debtors were, as of the Petition Date, jointly and severally indebted to the First Lien NV Agent and the First Lien NV Lenders on account of any and all amounts owing or outstanding under the First Lien NV Financing Documents (the "First Lien NV Indebtedness") in a total amount of not less than $227,010,983, which is comprised of outstanding principal of $212,480,640, accrued but unpaid interest of $8,229,797, costs of breaking the interest rate swap agreements of $6,300,546, and unpaid fees, costs, and expenses in an unliquidated amount.

15.     Also, on November 1, 2007, the PBC Debtors[3] entered into a Credit Agreement (the "First Lien PBC Credit Agreement", and together with all other agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection

---

[3] PBC Television Holdings, LLC was not an original party to the First Lien PBC Credit Agreement (as defined below), but later joined that agreement on December 24, 2007 and became a guarantor thereto.

therewith, the "First Lien PBC Financing Documents"; the First Lien NV Credit Agreement and the First Lien PBC Credit Agreement are, collectively, the "First Lien Credit Agreement") with UBS AG, Stamford Branch, as collateral agent and as administrative agent (collectively, the "First Lien PBC Agent", and together with the First Lien NV Agent, the "First Lien Agent") and the lenders party thereto (collectively, the "First Lien PBC Lenders", and together with the First Lien NV Lenders, the "First Lien Lenders"; the First Lien Agent and the First Lien Lenders are, collectively, the "First Lien Secured Parties").

16.     Pursuant to the First Lien PBC Financing Documents, the PBC Debtors were, as of the Petition Date, jointly and severally indebted to the First Lien PBC Agent and the First Lien PBC Lenders on account of any and all amounts owing or outstanding under the First Lien PBC Financing Documents (the "First Lien PBC Indebtedness") in a total amount of not less than $47,010,859, which is comprised of outstanding principal of $44,430,000, accrued but unpaid interest of $1,717,846, costs of breaking the interest rate swap agreements of $863,013, and unpaid fees, costs, and expenses in an unliquidated amount.[4]

17.     Pursuant to the First Lien Financing Documents, the NV Debtors and the PBC Debtors granted to and/or for the benefit of the First Lien Secured Parties first priority and continuing pledges, liens and security interests (the "First Lien Lenders' Liens") to secure the First Lien Indebtedness and any guarantees thereof, on and in substantially all of the property of the NV Debtors and the PBC Debtors, wherever located, whether real or personal, whether tangible or intangible, and whether now existing or hereafter acquired, including proceeds, products, offspring, rents, and profits thereof (the "Prepetition Collateral").

---

[4]  The First Lien NV Indebtedness and the First Lien PBC Indebtedness shall collectively be referred to as the "First Lien Indebtedness".

18.     Additionally, on November 1, 2007, the NV Debtors entered into a Secured Second Lien Credit Agreement (the "<u>Second Lien Credit Agreement</u>", and together with all other agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith, the "<u>Second Lien Financing Documents</u>")[5] with the lenders party thereto (collectively, the "<u>Second Lien Lenders</u>", and together with the First Lien Lenders, the "<u>Prepetition Lenders</u>"), and UBS AG, Stamford Branch, as collateral agent and as administrative agent (collectively, and including any successor agent, the "<u>Second Lien Agent</u>").[6]

19.     Pursuant to the Second Lien Financing Documents, the NV Debtors and the PBC Debtors granted to and/or for the benefit of the Second Lien Agent and the Second Lien Lenders second priority pledges, liens, and security interests on and in the Prepetition Collateral.

20.     The First Lien Agent and the Second Lien Agent are parties to an intercreditor agreement dated as of November 1, 2007 (the "<u>Intercreditor Agreement</u>"), pursuant to which the relative rights, obligations and priorities of the First Lien Lenders and the Second Lien Lenders are governed with respect to the Prepetition Collateral.  The Intercreditor Agreement establishes that the First Lien Lenders' liens are senior in priority to the Second Lien Lenders' liens on all Prepetition Collateral.

## VI.
## <u>THE DEBTORS' IMMEDIATE NEED FOR FINANCING AND USE OF CASH COLLATERAL</u>

21.     As discussed in detail in the Heinen Declaration, the Debtors have an immediate need for postpetition financing in order to continue the operation of their business for the duration of these chapter 11 cases, all in a continuing effort to preserve and maximize the value

---

[5]  The First Lien NV Financing Documents, the First Lien PBC Financing Documents and the Second Lien Financing Documents are, collectively, the "<u>Prepetition Financing Documents</u>".
[6]  Recently, Wilmington Trust FSB became a successor agent to UBS AG, Stamford Branch and is currently the Second Lien Agent.

of their assets and estates for the benefit of creditors, and to consummate a plan of reorganization that will maximize returns for all such creditors.  Heinen Decl. ¶ 32.

22.     Due to the fact that virtually all of the Debtors' cash constitutes "cash collateral," and all or substantially all of its non-cash assets are subject to the prepetition liens and security interests of the Prepetition Secured Parties,[7] the Debtors are currently without sufficient unencumbered funds with which to pay ongoing wages, salaries, and day-to-day operating expenses, including, but not limited to, rents and utilities, all of which are necessary to continue the operation of the Debtors' business in the short term, and otherwise administer the chapter 11 cases to conclusion.  Heinen Decl. ¶ 33.  Due to the nature and magnitude of their business, the Debtors' immediate access to the proposed DIP financing and use of cash collateral is necessary in order to maintain ongoing operations, maximize the value of their available assets in the near term, and avoid immediate and irreparable harm to their estates and creditors.  Heinen Decl. ¶ 33.

23.     As a result of extensive arm's length negotiations conducted by the Debtors, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, those parties have agreed and consented to permit the use of Cash Collateral and/or provide the Debtors with additional loans and financial accommodations during the postpetition period pursuant to (i) the terms of the DIP Facility Agreement, (ii) the terms of the proposed form of Order, and (iii) the Budget, pending the opportunity to conduct the Final Hearing.  Heinen Decl. ¶ 34.

24.     These financial accommodations, as described below, should enable the Debtors to commence, and continue to administer, in an orderly fashion, these chapter 11 cases, while

---

[7]  The "Prepetition Secured Parties" is defined in the Order to include, collectively, the First Lien Secured Parties, the Second Lien Agent and the Second Lien Lenders.

maintaining operations in order to maximize returns to all interested constituencies in the estates. Heinen Decl. ¶ 35.

## VII.
## THE DEBTORS' DECISION TO ENTER INTO THE DIP FACILITY AGREEMENT

25.     Leading up to these chapter 11 cases, the Debtors explored strategic alternatives and engaged in extensive negotiations with various parties in an effort to obtain additional liquidity.  Moelis & Co. LLC ("Moelis"), the Debtors' financial advisors, assisted the Debtors in that process.  Prior to the Petition Date, Moelis contacted ten parties to gauge their interest in providing debtor in possession financing.  Heinen Decl. ¶ 36..  Moelis solicited these parties' interest in providing funding on either a priming or junior basis.  Heinen Decl. ¶ 36.

26.     Given the magnitude of the financing required, the complexity of the Debtors' business, the immediacy of the Debtors' financing needs, and the liens on the Debtors' assets, none of the institutions contacted (other than the DIP Lenders) were in a position to provide debtor in possession financing that satisfied the Debtors' needs.  Heinen Decl. ¶ 37.  Thus, the Debtors were unable to obtain alternative postpetition financing proposals from other lenders through credit allowable as an administrative expense or secured by liens on the Debtors' assets junior to the liens of the Prepetition Secured Parties or on better terms than those provided by the DIP Lenders.  Heinen Decl. ¶ 37.  Indeed, no proposals for alternative financing were received. Heinen Decl. ¶ 37.

27.     Faced with these circumstances, and given the inability to find other postpetition financing, the Debtors engaged in good faith, arms-length negotiations with the DIP Agent and the DIP Lenders over the course of several weeks, which culminated in the DIP Facility Agreement.  Heinen Decl. ¶ 38.  During the negotiations, the Debtors, with the assistance of their advisors, went to great lengths under difficult circumstances to achieve the best deal

possible for themselves and their constituents.  Heinen Decl. ¶ 38.  As such, the DIP Lenders made several key concessions, including, among others, better pricing, the relaxation of key case milestones, the modification of the funding mechanics for the new money commitment and the modification and elimination of certain covenants.  Heinen Decl. ¶ 38.  Moreover, the DIP Facility constitutes a new money financing arrangement and does not involve any roll-up of the Debtors' prepetition obligations under the Prepetition Financing Documents.  Heinen Decl. ¶ 38. Without certain accommodations to the DIP Lenders such as the granting of the DIP Facility Superpriority Claims and the DIP Facility Liens, however, the DIP Lenders would not provide the postpetition DIP financing on the advantageous terms negotiated by the Debtors and described herein.  Heinen Decl. ¶ 38.  Moreover, even if alternative financing was available, the DIP Lenders were not agreeable to any priming facility.  Heinen Decl. ¶ 38.

28.     In this extremely challenging credit market, the Debtors have been unable to find alternative or better financing on the terms and of the type and magnitude required in these chapter 11 cases on an unsecured basis, or without offering terms substantially similar to those provided under the DIP Facility Agreement.  Heinen Decl. ¶ 39.  The Debtors ultimately decided that the proposal for debtor in possession financing advanced by the DIP Agent and the DIP Lenders was the most favorable under the circumstances, could be documented and accessed quickly, and adequately addressed the Debtors' reasonably foreseeable liquidity needs, while maintaining the going concern value of the Debtors' business.  Heinen Decl. ¶ 39.  For the foregoing reasons, the Debtors respectfully submit that entry into the DIP Facility Agreement is in the best interests of their estates, creditors and other parties in interest.

# VIII.
## MATERIAL TERMS OF THE DIP FACILITY AGREEMENT AND PROVISIONS THAT POTENTIALLY IMPLICATE LOCAL BANKRUPTCY RULE 4001-2

**A.      Material Terms of the DIP Facility Agreement.**

29.      The principal terms of the DIP Facility Agreement are as follows:[8]

| | |
|---|---|
| DIP Borrowers: | NV Broadcasting, LLC and its direct and indirect subsidiaries are borrowers under the DIP Facility Agreement. Financing for the PBC Debtors, NV Television, LLC, NV Media, and NVT Kansas will be supplied by way of the Order allowing use of Cash Collateral. |
| DIP Guarantors: | The DIP Facility is unconditionally guaranteed on a joint and several basis by (i) NV Television, LLC, (ii) NV Media, (iii) NVT Kansas, (iv) the PBC Debtors, and (v) future direct and indirect domestic and, unless it would result in material adverse tax consequences, foreign subsidiaries of each DIP Borrower. |
| DIP Lenders: | The lenders identified on the signature pages to the DIP Facility Agreement. |
| Administrative and Collateral Agent: | UBS AG, Stamford Branch. |
| Arranger: | UBS Securities LLC. |
| Type and Amount of DIP Facility: | First priority senior secured multiple draw term loan credit facility in an aggregate principal amount of $28,000,000 of "new money" liquidity (the "DIP Loan Commitment"). |
| | Upon the entry of the Order authorizing and approving the DIP Facility and use of cash collateral, the DIP Borrowers shall be entitled to borrow up to $16,000,000, an amount sufficient to meet the Debtors' working capital and other needs pending the final hearing, in accordance with the Budget and per the terms and conditions of the Order. |
| | Upon the entry of a Final Order authorizing and approving the DIP Facility and use of cash collateral, the DIP Borrowers shall be entitled to borrow all amounts available under the DIP Facility, in accordance with the Budget (subject to any permitted variances) and the DIP Orders. |

---

[8] The following description of the terms of the DIP Facility is intended solely to provide the Court and interested parties with a brief overview of the significant terms thereof. For a complete description of the terms and conditions of the DIP Facility, reference should be made to the DIP Facility Documents. This summary is qualified in its entirety by the provisions of the DIP Facility Agreement and the Order. For the purposes of this section of the Motion only, capitalized terms used but not otherwise defined in the Motion shall have the meanings ascribed to them in the DIP Facility Agreement. In addition, the Order remains subject to continuing negotiations among parties in interest. The Debtors reserve all rights in connection with the Order.

| | |
|---|---|
| <u>Use of Proceeds</u>: | The proceeds of the loans under the DIP Facility shall be used to, among other things, (a) fund general corporate working capital and capital expenditure needs in accordance with the Budget, including, without limitation, payment of interest and fees under the DIP Facility and cash collateral for letters of credit, and (b) pay allowed and approved administrative expenses of the bankruptcy cases, subject to the terms of the DIP Facility Agreement. |
| <u>Maturity</u>: | Earlier of (i) February 28, 2010 (ii) closing of a sale of all or substantially all of the DIP Borrowers' and DIP Guarantors' assets, (iii) acceleration of obligations owing under the DIP Facility following an Event of Default, and (iv) the effective date of a confirmed plan of reorganization. |
| <u>Availability & Carve-Out</u>: | Up to $28,000,000, less a reserve for the carve-out amount of up to $1,000,000 for the payment of professional fees, U.S. Trustee fees, and other similar administrative costs (the "<u>Carve-Out</u>"). |
| <u>Interest</u>: | <u>ABR Term Loans</u>. Each ABR Borrowing shall bear interest at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin. |
| | <u>Eurodollar Term Loans</u>. Each Eurodollar Borrowing shall bear interest at a rate per annum equal to the Adjusted LIBOR Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin. |
| | <u>Default Rate</u>. If an Event of Default shall occurs and is continuing, interest shall accrue, after as well as before judgment, at a rate per annum equal to 2% *plus* the rate otherwise applicable. |
| <u>LIBOR Floor</u>: | 3.00%. |
| <u>Pricing</u>: | LIBOR <u>plus</u> 10.00%. |
| <u>Fees</u>: | 1.  Initial Fee – 3.00% of the DIP Loan Commitment to the DIP Agent, for the benefit of the DIP Lenders, to be paid at closing. |
| | 2.  Subsequent Fee – 3.00% of the outstanding loans funded under the DIP Loan Commitment to the DIP Agent, for the benefit of the DIP Lenders, to be paid upon the Maturity Date (or such earlier date of repayment of the DIP Facility). |
| | 3.  Administrative Agent Fee – DIP Agent's administrative fees to be payable in the amounts and at the times separately agreed upon between Borrowers and the Administrative Agent in the Fee Letter. |
| | 4.  Commitment Fee – 0.50% per annum. |
| | 5.  LC and Fronting Fees – The DIP Borrowers agree to pay (i) to the DIP Agent a participation fee with respect to its participations in Letters of Credit, which shall accrue at a rate equal to the Applicable Margin from time to time used to determine the interest rate on Eurodollar Term |

Loans on the average daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to Reimbursement Obligations) during the period from and including the Closing Date to but excluding the later of the date on which such Lender's Term Loan Commitment terminates and the date on which such Lender ceases to have any LC Exposure, and (ii) to the Issuing Bank a fronting fee, which shall accrue at the rate of 0.325% per annum on the average daily amount of the LC Exposure (excluding any portion thereof attributable to Reimbursement Obligations) during the period from and including the Closing Date to but excluding the later of the date of termination of the Term Loan Commitments and the date on which there ceases to be any LC Exposure, as well as the Issuing Bank's customary fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder.

DIP Facility Liens:

As security for the repayment of the Postpetition Indebtedness, pursuant to sections 364(c)(2), (c)(3), and (d) of the Bankruptcy Code, the DIP Agent, on behalf of itself and the DIP Lenders, is hereby granted (without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, account control agreements, financing statements, or otherwise) the DIP Facility Liens on the Collateral (excluding Avoidance Actions, as defined in the DIP Facility Agreement). The DIP Facility Liens are valid, binding, enforceable, and fully perfected as of the date hereof, not subject to subordination, impairment, or avoidance, for all purposes in the Cases and any successor case. The DIP Facility Liens granted herein shall prime and be senior in all respects to the Prepetition Liens and the Replacement Liens pursuant to section 364(d) of the Bankruptcy Code. Upon entry of the Order, all possessory collateral held by any Prepetition Agents shall be deemed to have been transferred to the DIP Agent and all lockbox, blocked account, and similar control agreements shall be deemed assigned to the DIP Agent, on behalf of the DIP Lenders.

DIP Facility Superpriority Claims:

For all of the Postpetition Indebtedness and any other of the Debtors' obligations arising under the DIP Facility Documents, the DIP Lenders and DIP Agent are each granted, pursuant to section 364(c)(1) of the Bankruptcy Code, subject only to the Carve-Out, the allowed DIP Facility Superpriority Claims, which claims shall be payable from and have recourse to, in addition to the Collateral, any unencumbered prepetition or postpetition property of the Debtors whether now existing or hereafter acquired; provided, however, that the DIP Facility Superpriority Claims shall not be payable from any Avoidance Actions or the proceeds of any Avoidance Actions. The DIP Facility Superpriority Claims shall be deemed legal, valid, binding, enforceable, and perfected claims, not subject to subordination, impairment, or avoidance other than as specifically provided for herein, for all purposes in the Cases and any successor case.

| Adequate Protection: | To the First Lien Agent and the First Lien Lenders: |
|---|---|

(a)     To the extent there is a diminution in the First Lien Agent's interests in the Prepetition Collateral (whether the reason for such diminution is as a result of, arises from, or is attributable to, the imposition of the automatic stay, the priming of the First Lien Lenders' Liens, the use of Cash Collateral or the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Prepetition Collateral), the First Lien Agent, on behalf of the First Lien Lenders, will be granted the First Lien Replacement Liens in the Collateral, subject to the Carve-Out, which liens will be valid, binding, enforceable and fully perfected and will be subordinate only to the DIP Liens, Permitted Prior Liens, and First Lien Lenders' Liens;

(b)     Subject to the Carve-Out, an allowed administrative claim (the "First Lien Administrative Claim") against the Debtors' estates under section 507(b) of the Bankruptcy Code to the extent that the First Lien Replacement Liens do not adequately protect the diminution in the value of the First Lien Agent's interests in the Prepetition Collateral, which First Lien Administrative Claim, if any, shall be junior and subordinate only to the DIP Facility Superpriority Claims;

(c)     To the extent provided in the First Lien Credit Agreement, within ten (10) business days following the Debtors' receipt of a written summary invoice (with a copy delivered to the U.S. Trustee and counsel to the Committee (if appointed)), payments of the First Lien Agent's reasonable fees and expenses for legal counsel, financial advisors, auditors and other professionals for services rendered prepetition or postpetition on behalf of the First Lien Agent or its counsel and payments of each of the First Lien Lenders' reasonable fees and expenses for legal counsel, auditors, financial advisors and other professionals for services rendered prepetition or postpetition; provided, that none of such fees and expenses as adequate protection payments hereunder shall be subject to approval by the Court or to the United States Trustee Guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; provided, further, that if an objection to a professional's invoice is made within ten (10) business days following the Debtors' receipt of such invoice, the Debtors shall only be required to pay the undisputed amount and the Court shall have jurisdiction to determine any dispute concerning such invoice; provided, further, that such payments shall be provisional in nature, and if and to the extent that any payment(s) is challenged by a party in interest under section 506(b) of the Bankruptcy Code and ultimately not allowed under such provision, such payment(s) may be recharacterized as a payment of principal on the indebtedness under the First Lien Credit Agreement; and

(d)     The right to petition this Court for any such additional protection with respect to the First Lien Indebtedness or otherwise, including, without limitation, the First Lien Agent's and First Lien Lenders' right to request additional adequate protection of their interests in the Prepetition

Collateral or the Cash Collateral or relief from or modification of the automatic stay extant under section 362 of the Bankruptcy Code.

To the Second Lien Agent and the Second Lien Lenders:

(a)    To the extent there is a diminution in the Second Lien Agent's interests in the Prepetition Collateral, the Second Lien Agent, on behalf of the Second Lien Lenders, will be granted the Second Lien Replacement Liens in the Collateral, subject to the Carve-Out, which liens will be valid, binding, enforceable and fully perfected and will be subordinate only to the DIP Liens, Permitted Prior Liens, First Lien Lenders' Liens and First Lien Replacement Liens; and

(b)    To the extent provided in the Second Lien Credit Agreement, within ten (10) business days following the Debtors' receipt of a written summary invoice (with a copy delivered to the U.S. Trustee and counsel to the Committee (if appointed)), payments of the Second Lien Agent's reasonable fees and expenses for legal counsel, financial advisors, auditors and other professionals for services rendered prepetition or postpetition on behalf of the Second Lien Agent or its counsel and payments of each of the Second Lien Lenders' reasonable fees and expenses for legal counsel, auditors, financial advisors and other professionals for services rendered prepetition or postpetition; provided, that none of such fees and expenses as adequate protection payments hereunder shall be subject to approval by the Court or to the United States Trustee Guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; provided, further, that if an objection to a professional's invoice is made within ten (10) business days following the Debtors' receipt of such invoice, the Debtors shall only be required to pay the undisputed amount and the Court shall have jurisdiction to determine any dispute concerning such invoice; provided, further, that such payments shall be provisional in nature, and if and to the extent that any payment(s) is challenged by a party in interest under section 506(b) of the Bankruptcy Code and ultimately not allowed under such provision, such payment(s) may be recharacterized as a payment of principal on the indebtedness under the Second Lien Credit Agreement.

Financial Covenants:    Compliance with the Budget within a permitted negative variance for cash collections and cash disbursements not greater than 15%, tested on a rolling four-week period basis (provided such test shall be completed weekly until such time as four complete consecutive weeks have elapsed after the closing date as follows: (i) not greater than 20% in week 1; (ii) 18.33% for the two cumulative weeks ended in week 2; (iii) 16.66% for the three cumulative weeks ended in week 3; and (iv) 15% for the four consecutive weeks ended in week 4 and for each rolling four week period thereafter until the final maturity date; provided, however, testing with respect to disbursements for professionals and advisors of the Debtors or any committee shall be tested on a cumulative basis under the terms of the DIP Facility).

| | |
|---|---|
| <u>Financial Reports</u>: | The DIP Borrowers shall provide a detailed, line by line, computation of actual to budget deviations on the following basis: (i) weekly; (ii) for the cumulative four weeks then ended (or such lesser cumulative period until four weeks have elapsed); and (iii) cumulative variance since entry of the Final Order. |
| | In addition, the Debtors shall provide a weekly summary of material station level activities such as material terminations, resignations, major accounts won or lost, promotional events, technical failures (insured damages etc), and material programming changes. |
| <u>Compliance with Milestones</u>: | Unless otherwise waived by the DIP Lenders in their sole discretion, the Debtors must take all actions necessary to achieve the milestones set forth in Schedule M to the DIP Facility Agreement by the dates specified therein (or such later date as may be agreed to by the DIP Lenders in their sole discretion). |
| <u>Borrowing Conditions</u>: | The conditions to the initial credit extension of $16,000,000 to the DIP Borrowers are set forth in Section 4.01 of the DIP Facility Agreement and such conditions include, but are not limited to, the DIP Lenders' approval of the loan documents, first day pleadings, the Budget and receipt of the opinions of counsel, an officers' certificate of compliance and certain fees. |
| | The conditions to all credit extensions (including the initial credit extension) are set forth in Section 4.02 of the DIP Facility Agreement and such conditions include, but are not limited to, the compliance of the Debtors with all terms of the DIP Facility and the lack of any default occurring thereunder, compliance with the Budget, and the Debtors' necessity of establishing the cash collateral required prior to or concurrently with any such extension. |
| <u>Events of Default</u>: | The Events of Default under the DIP Facility Agreement are set forth in Section 8.01 and include, but are not limited to, the following: (i) the Debtors' failure to pay any principal or interest, regardless of amount, due in respect of any Indebtedness (other than the Obligations) incurred or entered into after the Petition Date, when and as the same shall become due and payable beyond any applicable grace period; (ii) one or more final judgments, orders or decrees for the payment of money in an aggregate amount in excess of a Material Amount shall be rendered against any Company or any combination thereof and the same shall remain undischarged, unvacated or unbonded for a period of thirty (30) consecutive days during which execution shall not be effectively stayed; (iii) other than with respect to items of Collateral with an aggregate value not exceeding a Material Amount, any security interest and Lien purported to be created by any Security Document shall cease to be in full force and effect (other than in accordance with its terms), or shall cease to give the Collateral Agent, for the benefit of the Secured Parties, the Liens, rights, powers and privileges purported to be created and granted under such Security Document (including a perfected first |

priority security interest in and Lien on all of the Collateral thereunder (except as otherwise expressly provided in such Security Document and Permitted Liens)) in favor of the Collateral Agent, or shall be asserted by Borrowers or any other Loan Party in writing not to be a valid, perfected, first priority (except as otherwise expressly provided in the DIP Facility Agreement or such Security Document) security interest in or Lien on the Collateral covered thereby; (iv) any Loan Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by any Loan Party or any PBC Entity seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or any Loan Party or any PBC Entity shall repudiate or deny any portion of its liability or obligation for the Obligations other than payment in full or in part of the Obligations; (v) there shall have occurred a Change in Control; (vi) there shall have occurred the termination, cancellation, nonrenewal or renewal on materially adverse terms of any FCC Licenses that would reasonably be expected to have a Material Adverse Effect; (vii) one or more ERISA Events shall have occurred that when taken together with all other such ERISA Events that have occurred, could reasonably be expected to result in liability of any Company in an aggregate amount in excess of a Material Amount or in the imposition of a Lien on any properties of a Company; (viii) there shall be an assignment for the benefit of creditors or any marshalling of assets and liabilities of any Loan Party; or (ix) the occurrence in the Chapter 11 Cases of any of the adverse events to the position of the DIP Agent or the DIP Lenders described in Section 8.01(p) of the DIP Facility Agreement.

Rights and Remedies
Upon Event of Default:    So long as any such Event of Default shall be continuing, with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court, subject to the terms of the Loan Documents and the Financing Orders:  (i) suspend the Commitments with respect to additional Loans and/or the incurrence of additional Letters of Credit, whereupon any additional Credit Extension and additional Letter of Credit shall be made or incurred in the Administrative Agent's sole discretion (or in the sole discretion of the Required Lenders, if such suspension occurred at their direction) so long as such Event of Default is continuing; (ii) increase the rate of interest applicable to the Loans and Letters of Credit; (iii) declare the Commitments and the Issuing Bank's obligations to issue the Letters of Credit to be terminated forthwith, whereupon the Commitments and such obligations shall immediately terminate; (iv) declare all or a portion of the Loans (with accrued interest thereon) and all other amounts owing under the DIP Facility Agreement and the Notes to be due and payable forthwith, whereupon the same shall immediately become due and payable without presentment, demand, protest or any other notice of any kind (except as provided in the Loan

Documents and the Financing Orders), all of which are hereby expressly waived by the DIP Borrowers and the DIP Guarantors and the interest thereon shall be increased to the default interest rate specified in Section 2.06(c), and (B) declare all or a portion of the obligations of the DIP Borrowers in respect of the Letters of Credit, although contingent and unmatured, to be due and payable forthwith, whereupon the same shall immediately become due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the DIP Borrowers and the Guarantors and interest thereon shall be increased to the interest rate specified in Section 2.06(c), and/or demand that the DIP Borrowers discharge any or all of the obligations supported by the Letters of Credit by paying or prepaying any amount due or to become due in respect of such obligations; (v) direct any or all of the Loan Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions reasonably acceptable to the Administrative Agent pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Loan Party to assume and assign any lease or executory contract included in the Collateral to the Administrative Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code); (vi) enter onto the premises of any Loan Party in connection with an orderly liquidation of the Collateral; or (vii) exercise any rights and remedies provided to the Administrative Agent under the Loan Documents or at law or equity, including all remedies provided under the Code and, pursuant to the Interim Order and the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit the Administrative Agent and the Lenders to exercise their remedies under the DIP Facility Agreement and the Loan Documents, without further notice, application or motion to, hearing before, or order from, the Bankruptcy Court, *provided, however*, notwithstanding anything to the contrary contained herein, the Administrative Agent shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of and the Loan Party in the Collateral only upon three (3) days prior written notice to such Loan Party and counsel approved by the Bankruptcy Court for the Committee.

Exit Facility:

DIP Lenders agree, upon the effectiveness of a confirmed plan of reorganization that is proposed by the Debtors and supported by the DIP Lenders, to convert the DIP Loan Commitments under the DIP Facility into commitments under an exit facility for the DIP Borrowers in the same amount of such existing commitments, which shall mature 3 years following the closing date of such exit facility and shall otherwise be on substantially similar terms as the DIP Facility.

Fee Reimbursement:

Upon notice to the U.S. Trustee and counsel to the Committee (if appointed), the DIP Agent and each of the DIP Lenders shall be entitled to prompt reimbursement of their reasonable fees and expenses of their respective counsel, arising from or related to the DIP Facility or the Cases.

Financial Advisor:    The DIP Agent shall continue to retain a financial advisor, appraisers, and other third-party consultants under the DIP Facility, as may otherwise be provided for in the Prepetition Financing Documents.

**B.    Highlighted Provisions Under Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-2.**

   **1.    Bankruptcy Rule 4001**

   30.    The provisions described in Bankruptcy Rule 4001(b)(1)(B)(i)-(iv), to the extent applicable, are set out at the following sections of the Order and/or the DIP Facility Agreement:

   (a) <u>Name of Each Entity with an Interest in the Cash Collateral</u>.  Order ¶¶ D, E.

   (b) <u>Purposes for the Use of Cash Collateral</u>.  Order ¶¶ G, 2, 8.

   (c) <u>Material Terms, including Duration, of the Use of Cash Collateral</u>.  Order ¶¶ I, N, 2, 8.

   (d) <u>Liens, Cash or Other Adequate Protection Provided</u>.  Order ¶¶ 3, 4, 9, 10.

   31.    The provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi), to the extent applicable, are set out at the following sections of the Order and the DIP Facility Agreement:

   (a) <u>Grant of Priority or a Lien on Property of the Estate</u>.  Order ¶¶ 3, 4; DIP Facility Agreement § 2.20, 3.20, 3.25(b) and (c), 5.12.

   (b) <u>Adequate Protection or Priority for a Claim that Arose before the Commencement of the Case</u>.  Order ¶¶ 3, 9, 10; DIP Facility Agreement § 2.20.

   (c) <u>Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose before the Commencement of the Case</u>.  Order ¶¶ D, E, F.

   (d) <u>Waiver or Modification of the Automatic Stay</u>.  Order ¶¶ 13, 15; DIP Facility Agreement § 8.01 (i)-(vii), 3.25(e), 7.05.

   (e) <u>Waiver or Modification of Authority to File a Plan, Seek an Extension of Time in which the Debtor has the Exclusive Right to File a Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit</u>.  Order ¶ 12; DIP Facility Agreement § 2.24.

   (f) <u>Establishment of Deadlines for Filing a Plan of Reorganization, for Approval of a Disclosure Statement, for a Hearing on Confirmation or Entry of a Confirmation Order</u>.  DIP Facility Agreement § 5.19, Schedule M.

(g)  <u>Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien</u>.  Order ¶¶ D, 4, 13, 14.

(h)  <u>Release, Waiver or Limitation on any Claim or Cause of Action Belonging to the Estate</u>.  Order ¶¶ D(vi), D(vii), 3, 4, 6, 7; DIP Facility Agreement §§ 2.20(c), 2.23, 3.12, 10.03(d).

(i)  <u>Indemnification of Any Entity</u>.  DIP Facility Agreement, § 10.03(b).

(j)  <u>Release, Waiver or Limitation on Rights under Section 506(c)</u>.  Order ¶ 7; DIP Facility Agreement § 2.20(c).

(k)  <u>Liens Granted on Claims Arising Under Chapters 5 or 7</u>.  Order ¶¶ (3)(b), 4; DIP Facility Agreement § 2.20, p. 4 (definition of "Avoidance Actions"), p. 7 (definition of "Collateral").  The DIP Facility Agreement provides the DIP Agent and the DIP Lenders with a lien on claims and causes of action pursuant to Section 549 of the Bankruptcy Code and the proceeds thereof, but only to the extent the transfer avoided was of an asset otherwise constituting Collateral.  Other than this provision, the DIP Agent and the DIP Lenders are not granted liens on any other Chapter 5 or 7 claims.

## 2.  Local Bankruptcy Rule 4001-2

32.    Local Bankruptcy Rule 4001-2 requires that certain provisions contained in the Order and the DIP Facility Agreement be highlighted and that the Debtors provide justification for the inclusion of such highlighted provisions.  The Debtors believe that the following provisions of the Order and the DIP Facility Agreement are required to be identified in accordance with Local Bankruptcy Rule 4001-2 and that such provisions are justified and necessary in the context and circumstances of these cases.  If a provision of Local Bankruptcy Rule 4001-2 is not discussed below, it means that the Order or the DIP Facility Agreement does not contain a provision that triggers disclosure under that rule.

### (i)    **Local Bankruptcy Rule 4001-2(a)(i)(B)**

33.    Local Bankruptcy Rule 4001-2(a)(i)(B) requires a movant to identify provisions that bind the estates or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor

without first giving parties in interest at least 75 days from the entry of the order and the

creditors' committee, if formed, at least 60 days from the date of its formation to investigate such

matters.  Del. Bankr. L.R. 4001-2(a)(i)(B).

34.    The Order provides that:

(a) the Committee, if appointed, shall have until the later of (i) 60 days
from the date of appointment of the Committee and (ii) 75 days from the
entry of this Order, and (b) any other non-debtor party in interest
(including, without limitation, any receiver, administrator or trustee
appointed or elected in any of the Cases or any successor case or in any
jurisdiction) shall have until 75 days from the entry of this Order (the
applicable date, the "Investigation Termination Date") to investigate the
validity, perfection, and enforceability of the First Lien Lenders' Liens
and the amount and allowability of the First Lien Indebtedness, or to assert
any other claims or causes of action against any of the First Lien Agent or
any of the First Lien Lenders.  If the Committee (if appointed), or any
non-debtor party in interest, determines that there may be a challenge by
the Investigation Termination Date, upon five (5) days' written notice to
the Debtors and the applicable First Lien Agent, such Committee (if
appointed) or other non-debtor party in interest shall have only until the
Investigation Termination Date to commence an adversary proceeding or
contested matter (each, a "Challenge"), as required by the applicable
Bankruptcy Rules, on behalf of the Debtors' estates setting forth the basis
of any such Challenge.  In no event shall the filing of any such Challenge
affect any of the rights, privileges, powers or remedies of the Prepetition
Secured Parties under the Order or the First Lien Financing Documents
pending a ruling on such Challenge.  If no Challenge is filed on or before
the Investigation Termination Date (or such other later date as extended by
the written consent of the Debtors and the First Lien Agent), then the
agreements, acknowledgements, releases and stipulations contained in
paragraph D of the Order shall be irrevocably binding on the estates, the
Committee (if appointed), and all other parties in interest (including,
without limitation, any receiver, administrator, or trustee appointed in any
of the Cases or any successor case or in any jurisdiction) without further
action by any party or this Court, and the Committee and any other party
in interest (including without limitation a receiver, administrator, or
trustee appointed in any of the Cases or any successor case or in any
jurisdiction) shall thereafter be forever barred from bringing any
Challenge with respect to the First Lien Agent or any First Lien Lender.  If
a Challenge is timely filed on or before the Investigation Termination
Date, all claims and actions against the First Lien Agent and the First Lien
Lenders not expressly asserted in such Challenge shall be deemed,
immediately and without further notice, motion or application to, order of,

or hearing before, this Court, to have been forever relinquished, discharged, released and waived. Nothing in this Order (a) confers standing on any party to file or prosecute such Challenge other than as to the Committee (if appointed), which shall be deemed to have standing or (b) precludes the First Lien Agent or any First Lien Lender from seeking allowance of all or any portion of the First Lien Indebtedness prior to the occurrence of the Investigation Termination Date.

Order ¶ 6.

35.     Because this provision affords parties in interest the requisite investigation period, the Debtors respectfully submit that it complies with the Local Bankruptcy Rules.

### (ii)     **Local Bankruptcy Rule 4001-2(a)(i)(C)**

36.     Local Bankruptcy Rule 4001-2(a)(i)(C) requires explicit disclosure of provisions that constitute a waiver, without notice, of the estates' rights under section 506(c) of the Bankruptcy Code. The Order and the DIP Facility Agreement provide for a waiver of the Debtors' section 506(c) claims against the DIP Agent, the DIP Lenders and any of the First Lien Secured Parties only upon entry of the Final Order. Order ¶ 7; DIP Facility Agreement, § 2.20(c). As the effectiveness of this waiver will be delayed until the entry of the Final Order, the Debtors respectfully submit that parties in interest will have an opportunity to be heard and, as such, the waiver will not be "without notice."

### (iii)     **Local Bankruptcy Rule 4001-2(a)(i)(D)**

37.     Local Bankruptcy Rule 4001-2(a)(i)(D) requires disclosure of provisions under which the Debtors immediately grant liens on the Debtors' claims or causes of action under 11 U.S.C. §§ 544, 545, 547, 548 and 549. The DIP Facility Agreement provides the DIP Agent and the DIP Lenders with a lien, in the form of the DIP Facility Lien, on claims or causes of action pursuant to section 549 of the Bankruptcy Code and the proceeds thereof, but only to the extent the transfer avoided was of an asset otherwise constituting Collateral. Order ¶¶ (3)(b), 4; DIP Facility Agreement § 2.20, p. 4 (definition of "Avoidance Actions"), p. 7 (definition of

"Collateral").  As set forth herein, the Debtors have an immediate need to access the DIP Facility and have determined that the terms of the DIP Facility are the best available under the circumstances.  The proposed, immediate lien on claims or causes of actions is limited to those solely under section 549 of the Bankruptcy Code where the transfer avoided was of an asset otherwise constituting Collateral.  The Debtors respectfully submit that this limitation renders the proposed lien reasonable under the circumstances.

(iv)     **Local Bankruptcy Rule 4001-2(a)(i)(G)**

38.     Pursuant to Local Bankruptcy Rule 4001-2(a)(i)(G), a movant must describe provisions of the proposed debtor in possession facility which contemplate a priming of any secured lien without the consent of that lienor.

39.     The DIP Facility is a "priming" facility inasmuch as the Debtors have agreed to grant the DIP Agent, for the benefit of the DIP Lenders, pursuant to section 364(c)(2) and (c)(3) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable and automatically and properly perfected senior liens (the "<u>DIP Facility Liens</u>") in all Collateral (as defined in the DIP Facility Agreement) to secure any and all of the Debtors' obligations, indebtedness, and liabilities under the DIP Facility Agreement (the "<u>Postpetition Indebtedness</u>"), which liens are senior to the existing liens of the Prepetition Secured Parties.  Order ¶ 4; DIP Facility Agreement §§ 2.20, 3.20, 3.25(c), 5.12.  The Prepetition Secured Parties have consented to the terms of the DIP Facility and the Order, including the priming of the Prepetition Liens.

40.     In addition to the DIP Facility Liens, the Debtors have agreed that for all of the Postpetition Indebtedness and the other obligations arising under the DIP Facility Documents, the DIP Lenders and DIP Agent are each granted allowed superpriority administrative expense claims (collectively, the "<u>DIP Facility Superpriority Claims</u>") under section 364(c)(1) of the Bankruptcy Code against the Debtors, which DIP Facility Superpriority Claims shall be payable

from and have recourse to, in addition to the Collateral, any unencumbered prepetition or postpetition property of the Debtors whether now existing or hereafter acquired; provided, however, that the DIP Facility Superpriority Claims shall not be payable from any Avoidance Actions (as defined in the DIP Facility Agreement) or the proceeds of any Avoidance Actions and are subject to the Carve-Out. Order ¶ 3; DIP Facility Agreement §§ 2.20, 3.25(b).

41.     The Debtors submit that the postpetition financing proposal submitted by the DIP Lenders is the best available under the circumstances and that entry into the DIP Facility Agreement is in the best interests of the Debtors and their estates. Substantially all of the Debtors' assets are encumbered by the liens and security interests securing the Debtors' obligations under the Prepetition Financing Documents, and none of the potential lenders approached by the Debtors was willing to extend the Debtors credit on a junior priority basis.

42.     The Debtors considered a number of factors and engaged in good-faith negotiations with the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties prior to determining to enter into the DIP Facility Agreement. Given the Debtors' immediate liquidity needs, the current instability of the credit markets, and the dire state of the economy, the Debtors believe that the terms under the DIP Facility Agreement are the best that they are able to obtain.

## IX.
## BASIS FOR RELIEF REQUESTED

43.     The continued viability of the Debtors' business and the success of the Debtors' reorganizations efforts hinge upon obtaining access to sufficient postpetition financing and access to cash collateral. The preservation of the Debtors' business and the Debtors' ability to reorganize successfully depends heavily upon the expeditious approval of this Motion. Absent the Court's approval of the interim relief sought herein, the Debtors face a substantial risk of severe disruption to their business operations and irreparable damage to their business

relationships. At this time, the Debtors' request authorization to use Cash Collateral and borrow up to $16 million under the proposed DIP Facility Agreement on an interim basis. The Debtors intend to use such proceeds to, among other things, fund their operations. Approval of the DIP Facility Agreement and access to Cash Collateral will allow the Debtors to remain operational, including paying their current and ongoing operating expenses (e.g., postpetition wages, salaries, and utility costs).

44.     As set forth above, the DIP Facility is the only financing available to the Debtors at this time. The Debtors have been unable to procure sufficient financing (a) in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, (b) solely as an administrative expense under sections 364(a) and (b) of the Bankruptcy Code, or (c) in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c) of the Bankruptcy Code. In fact, the proposed financing under the DIP Facility Agreement was the only viable financing option presented to the Debtors and their advisors. Thus, based on the foregoing and for the reasons set forth below, the Debtors submit that they have satisfied the requirements to access postpetition financing on a superpriority, secured basis pursuant to sections 364(c) and (d) of the Bankruptcy Code and their proposed grant of adequate protection to use cash collateral is appropriate.

**A.      The Debtors' Satisfy The Requirements For Obtaining Financing Under Section 364(c) Of The Bankruptcy Code.**

45.     Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is (a) entitled to superpriority administrative expense status, (b) secured by a lien on otherwise unencumbered property, or (c) secured by a junior lien on encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, on an administrative expense priority or secured solely by junior liens on the debtor's assets. See 11

U.S.C. § 364(c); In re Ames Dept. Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), modified on other grounds, 75 B.R. 553 (debtor seeking unsecured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code).

46.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a)      the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

b)      the credit transaction is necessary to preserve the assets of the estate; and

c)      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

Ames Dep't Stores, 115 B.R. at 37-39; see also In re St. Mary Hosp., 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); Crouse Group, Inc., 71 B.R. at 549.

47.     While the Debtors were in the process of negotiating the terms of the DIP Facility, the Debtors also attempted to identify other sources of postpetition financing to determine whether they could obtain debtor in possession financing on better terms. Based on current capital market conditions and discussions with potential lenders, the Debtors determined that postpetition financing on an unsecured basis or on a junior priority basis would be unobtainable. Moreover, without postpetition financing, the Debtors would be unable to operate their business as a going-concern, which would significantly impair the value of the Debtors' assets and limit their ability to repay their debts and liabilities. Finally, as set forth above, given the Debtors' circumstances and the volatile conditions and lack of liquidity in the capital

markets, the Debtors believe that the terms of the DIP Facility are fair, reasonable, and adequate, all as more fully set forth herein.

**B.      The Debtors Satisfy The Requirements For Obtaining Credit Under Section 364(d) Of The Bankruptcy Code.**

48.      If a debtor is unable to obtain credit solely under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien (<u>i.e.</u>, a "priming lien"). <u>See</u> 11 U.S.C. § 364(d). Section 364(d)(1) of the Bankruptcy Code authorizes a debtor in possession to incur superpriority senior secured liens or "priming" liens if: (a) the debtor is unable to obtain financing from another source; and (b) the interests of the secured creditors whose liens are being primed by the DIP financing are adequately protected. <u>See id.</u> § 364(d)(1)(A) and (B). As explained above, the financing under the DIP Facility constituted the only viable financing option with terms comparable to those offered by the DIP Facility, and the priming liens are an essential part of the protections provided to the DIP Agent and the DIP Lenders thereunder. Moreover, as explained below, the interests of the Prepetition Secured Parties whose liens are being primed, are adequately protected under the terms of the Order.

**C.      The Debtors' Proposed Grant Of Adequate Protection To Use Cash Collateral Is Appropriate.**

49.      Not all of the Debtors' secured parties have agreed to participate in the DIP Facility, and even among those that have so agreed, none of them would have participated without being given adequate protection. Accordingly, because the DIP Facility contemplates providing the DIP Lenders with priming liens pursuant to section 364(d) of the Bankruptcy Code, the Debtors are required to show that the interests of the Prepetition Secured Parties are "adequately protected." <u>Id.</u> § 364(d). Additionally, pursuant to section 363(c) of the Bankruptcy

Code, the Debtors may only use Cash Collateral of the Prepetition Secured Parties, subject to the consent of those parties or the grant of adequate protection.  Id. § 363(c)(2).

50.     The Bankruptcy Code does not explicitly define "adequate protection."  However, section 361 of the Bankruptcy Code suggests that adequate protection may be provided by (i) periodic cash payments to the extent that there is a decrease in the lien holder's interest in the property; (ii) additional or replacement liens; or (iii) other relief resulting in the realization of the "indubitable equivalent" of the lien holder's interest in the property.  See 11 U.S.C. § 361.  The third option is regarded as a "catch-all" provision, affording courts discretion, on a case-by-case basis, to determine what level of protection is appropriate to provide to a secured party.  See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994).

51.     The goal of adequate protection is to protect a secured lender against a diminution in the value of its collateral during the reorganization process.  See, e.g., Swedeland, 16 F.3d at 564; In re 848 Brickell Ltd., 243 B.R. 142, 148 (S.D. Fla. 1998).  This is true whether the prepetition creditor is oversecured or undersecured – the protection to which the secured creditor is entitled is protection against any subsequent decrease in such creditor's interest in collateral that may be occasioned by the debtor's use thereof.  11 U.S.C. § 361.  Thus, it follows that if the value of the prepetition creditor's interest in collateral is not being diminished by the priming of its liens by a DIP credit facility, the creditor is not entitled to adequate protection.  See In re Integrated Health Services, Inc., 260 B.R. 71, 74 (Bankr. D. Del. 2001) (prepetition creditors only entitled to adequate protection to the extent of the decline in the value of their interests in collateral); see also In re Continental Airlines, Inc., 154 B.R. 176, 180 (Bankr. D. Del. 1993) (same).

52.     Where a debtor's proposed use of cash collateral and the use of funds from additional financing augment the value of the secured creditor's collateral, adequate protection exists.  In re Sky Valley, Inc., 100 B.R. 107 114 (Bankr. N.D. Ga. 1988) (noting the flexible nature of § 361(3) and observing case law support for the concept that an increase in the value of the collateral generated by improvements resulting from the superpriority financing could constitute adequate protection).  Indeed, courts have noted that "[a]ctivities of a debtor can enhance collateral value and thereby provide adequate protection."  In re Ralar Distrib., Inc., 166 B.R. 3, 6 (Bankr. D. Mass. 1994) (creditor had adequate protection where debtor's use of collateral allowed realization of more than liquidation value).

53.     In this case, access to the DIP Facility – which necessitates granting the DIP Agent, on behalf of itself and the DIP Lenders, the DIP Facility Liens on a priming basis under section 364(d) of the Bankruptcy Code – is critical to the Debtors' ability to continue operations. As a result of such proposed priming, the Debtors intend to provide the First Lien Secured Parties with the following forms of adequate protection:

(a)     To the extent there is a diminution in the First Lien Agent's interests in the Prepetition Collateral (whether the reason for such diminution is as a result of, arises from, or is attributable to, the imposition of the automatic stay, the priming of the First Lien Lenders' Liens, the use of Cash Collateral or the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Prepetition Collateral), the First Lien Agent, on behalf of the First Lien Lenders, will be granted replacement liens in the Collateral, subject to the Carve-Out (the "First Lien Replacement Liens"), which liens will be valid, binding, enforceable and fully perfected and will be subordinate only to the DIP Liens, Permitted Prior Liens, and First Lien Lenders' Liens;

(b)     Subject to the Carve-Out, an allowed administrative claim (the "First Lien Administrative Claim") against the Debtors' estates under section 507(b) of the Bankruptcy Code to the extent that the First Lien Replacement Liens do not adequately protect the diminution in the value of the First Lien Agent's interests in the Prepetition Collateral, which First Lien Administrative Claim, if any, shall be junior and subordinate only to the DIP Facility Superpriority Claims;

(c)     To the extent provided in the First Lien Credit Agreement, within ten (10) business days following the Debtors' receipt of a written summary invoice (with a copy

delivered to the U.S. Trustee and counsel to the Committee (if appointed)), payments of the First Lien Agent's reasonable fees and expenses for legal counsel, financial advisors, auditors, and other professionals for services rendered prepetition or postpetition on behalf of the First Lien Agent or its counsel and payments of each of the First Lien Lenders' reasonable fees and expenses for legal counsel, auditors, financial advisors and other professionals for services rendered prepetition or postpetition; provided, that none of such fees and expenses as adequate protection payments hereunder shall be subject to approval by the Court or to the United States Trustee Guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; provided, further, that if an objection to a professional's invoice is made within ten (10) business days following the Debtors' receipt of such invoice, the Debtors shall only be required to pay the undisputed amount and the Court shall have jurisdiction to determine any dispute concerning such invoice; provided, further, that such payments shall be provisional in nature, and if and to the extent that any payment(s) is challenged by a party in interest under section 506(b) of the Bankruptcy Code and ultimately not allowed under such provision, such payment(s) may be recharacterized as a payment of principal on the indebtedness under the First Lien Credit Agreement; and

(d)      The right to petition this Court for any such additional protection with respect to the First Lien Indebtedness or otherwise, including, without limitation, the First Lien Agent's and First Lien Lenders' right to request additional adequate protection of their interests in the Prepetition Collateral or the Cash Collateral or relief from or modification of the automatic stay under section 362 of the Bankruptcy Code.

54.      Similarly, the Debtors intend to provide the Second Lien Agent and the Second Lien Lenders with the following forms of adequate protection:

(a)      To the extent there is a diminution in the Second Lien Agent's interests in the Prepetition Collateral, the Second Lien Agent, on behalf of the Second Lien Lenders, will be granted replacement liens in the Collateral, subject to the Carve-Out (the "Second Lien Replacement Liens", and together with the First Lien Replacement Liens, the "Replacement Liens"), which liens will be valid, binding, enforceable, and fully perfected and will be subordinate only to the DIP Liens, Permitted Prior Liens, First Lien Lenders' Liens and First Lien Replacement Liens; and

(b)      To the extent provided in the Second Lien Credit Agreement, within ten (10) business days following the Debtors' receipt of a written summary invoice (with a copy delivered to the U.S. Trustee and counsel to the Committee (if appointed)), payments of the Second Lien Agent's reasonable fees and expenses for legal counsel, financial advisors, auditors and other professionals for services rendered prepetition or postpetition on behalf of the Second Lien Agent or its counsel and payments of each of the Second Lien Lenders' reasonable fees and expenses for legal counsel, auditors, financial advisors and other professionals for services rendered prepetition or postpetition; provided, that none of such fees and expenses as adequate protection payments hereunder shall be subject to approval by the Court or to the United States Trustee Guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; provided, further, that if an objection to a professional's invoice is made within ten (10) business days following the Debtors' receipt of such invoice, the Debtors shall only be required to pay the undisputed amount

and the Court shall have jurisdiction to determine any dispute concerning such invoice; provided, further, that such payments shall be provisional in nature, and if and to the extent that any payment(s) is challenged by a party in interest under section 506(b) of the Bankruptcy Code and ultimately not allowed under such provision, such payment(s) may be recharacterized as a payment of principal on the indebtedness under the Second Lien Credit Agreement.

55.     The Debtors believe that the proposed adequate protection is necessary and appropriate to ensure that the Debtors can continue to use the Cash Collateral and access liquidity under the DIP Facility.  Accordingly, the adequate protection proposed herein and in the DIP Orders is fair and reasonable and is sufficient to satisfy the requirements of sections 363(c) and 364(d) of the Bankruptcy Code.

**D.      Approval Of The DIP Facility On An Interim Basis Is Necessary To Prevent Immediate And Irreparable Harm.**

56.     Bankruptcy Rules 4001(b)(2) and 4001(c)(2) govern the procedures for obtaining authorization to use cash collateral and obtain postpetition financing, respectively.  Under those rules, during the 15-day period after the debtor files a motion for use of cash collateral and to obtain postpetition financing, the court may approve the motion to the extent "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2), (c)(2).

57.     Also, to the extent that the Debtors are seeking authority to sell, use or otherwise incur an obligation regarding property of their estates, Bankruptcy Rule 6003 provides that the Court may only grant such relief to the extent it is necessary to avoid "immediate and irreparable harm."  Id. 6003(b).

58.     In examining requests for interim relief under the "immediate and irreparable harm" standard, courts apply the same business judgment standard applicable to other business decisions.  See, e.g., Ames Dep't Stores, 115 B.R. at 36.  After the 15-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's

business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business.  Id.

59.     Immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis.  As described in detail above and in the Heinen Declaration, the Debtors need to obtain access to liquidity under the DIP Facility and use Cash Collateral in order to, among other things, continue the operation of their businesses, maintain business relationships with vendors and customers, make payroll, make capital expenditures, and satisfy other working capital and operational needs.  Funding each of these expenditures is necessary to the Debtors' ability to preserve and maintain their going-concern values for the benefit of all parties in interest.

60.     Accordingly, under the circumstances, entry of the Order is necessary to prevent immediate and irreparable harm to the estates and, therefore, is warranted under the requirements of the Bankruptcy Rules.

**E.     Modification Of The Automatic Stay Provided Under Section 362 Of The Bankruptcy Code Is Appropriate Under The Circumstances.**

61.     Paragraph 15 of the Order provides that the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby lifted to, among other things, permit the Debtors to grant various superpriority liens and claims as well as adequate protection liens, perform various obligations, incur various liabilities, permit the exercise of remedies by the DIP Agent following a default under the DIP Facility, and allow the DIP Lenders to file and record financing statements, mortgages, or other instruments to provide notice and evidence the grant and perfection of the liens.

62.     Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under

the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Facility Agreement and the proposed DIP Orders.

**X.**
**<u>REQUEST FOR FINAL HEARING</u>**

63.     Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), the Debtors respectfully request that the Court set a date for the Final Hearing that is no later than thirty (30) days following the Petition Date.

**XI.**
**<u>REQUEST FOR WAIVER OF STAY</u>**

64.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "a[n] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As set forth above, the DIP Facility is essential to prevent irreparable damage to the Debtors' operations, value and ability to reorganize.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 10-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

**XII.**
**<u>NOTICE</u>**

65.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the Internal Revenue Service; (iii) the Federal Communications Commission; (iv) the Office of the United States Attorney; (v) the Debtors' thirty largest unsecured creditors on a consolidated basis; (vi) counsel to the DIP Agent and the First Lien Agent; (vii) counsel to the Second Lien Agent; (viii) each of the Debtors' cash management banks; and (ix) all known parties asserting a lien against the Collateral.  Notice of this Motion will be served in accordance

with Local Bankruptcy Rule 9013-1(m).  In light of the nature of the relief requested, and the exigent circumstances of these cases, the Debtors submit that no further notice is necessary.

### XIII.
### NO PRIOR REQUEST

66.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court: (i) enter the Order, in substantially the same form as that attached as <u>Exhibit A</u>, granting the relief requested herein; and (ii) provide such other relief as the Court deems appropriate and just.

Dated: Wilmington, Delaware
      July 13, 2009

LOCKE LORD BISSELL & LIDDELL LLP
David W. Wirt (Pro Hac Vice Motion Pending)
Aaron C. Smith (Pro Hac Vice Motion Pending)
Courtney E. Barr (Pro Hac Vice Motion Pending)
111 S. Wacker Drive
Chicago, Illinois 60606-4410
Telephone: (312) 443-0700
Fax: (312) 443-6653

Omer F. Kuebel, III (Pro Hac Vice Motion Pending)
601 Poydras, Suite 2660
New Orleans, Louisiana 70130-6036
Telephone: (504) 558-5100
Fax: (504) 558-5200

-and-

POLSINELLI SHUGHART PC

   /s/ *Christopher A. Ward*
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
Shanti M. Katona (Pro Hac Vice Motion Pending)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Fax: (302) 252-0921

PROPOSED COUNSEL FOR THE NV DEBTORS,
NV MEDIA, AND NVT KANSAS

Respectfully submitted,

WOMBLE CARLYLE SANDRIDGE & RICE
PLLC

   /s/ *Francis A. Monaco, Jr.*
Francis A. Monaco, Jr. (Del. Bar No. 2078)
Mark L. Desgrosseilliers (Del. Bar No. 4083)
222 Delaware Avenue, 15th Floor
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Fax: (302) 252-4330

PROPOSED COUNSEL FOR THE PBC
DEBTORS